JAMES A. LASSART (CA SBN 40913)
ADRIAN G. DRISCOLL (CA SBN 95468)
SPENCER C. MARTINEZ (NV SBN 10927)
ROPERS, MAJESKI, KOHN & BENTLEY
201 Spear Street, Suite 1000
San Francisco, CA 94105-1667
Telephone:   (415) 543-4800
Facsimile:   (415) 972-6301

DOUGLAS L. MONSON (NV SBN 7829)
GOOLD PATTERSON ALES & DAY
4496 South Pecos Road
Las Vegas, NV 89084
Telephone:   (702) 436-2600
Facsimile:   (702) 436-2650

Attorneys for Plaintiff
SELLING SOURCE, LLC, a Delaware Limited
Liability Company

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA – SOUTHERN DIVISION

| | |
|---|---|
| SELLING SOURCE, LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>RED RIVER VENTURES, LLC, a Delaware Limited Liability Company; CURTIS POPE, an individual; CARL MICHAEL LANE, an individual; CHARLIE WURM, an individual; GORDON JONES, an individual; ZURAB DAVITIANI, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR (1) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT; (2) VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT; (3) TRADE SECRET MISAPPROPRIATION; (4) BREACH OF CONTRACT; AND (5) FEDERAL TRADEMARK INFRINGEMENT; DEMAND FOR JURY TRIAL** |

## I.   INTRODUCTION AND BACKGROUND

Plaintiff Selling Source, LLC ("Selling Source"), for its Complaint against Defendant Red River Ventures, LLC (hereafter, "Red River"), Curtis Pope ("Pope"), Carl Michael Lane ("Lane"), Charlie Wurm ("Wurm"), Gordon Jones ("Jones"), and Zurab Davitiani ("Davitiani"),

alleges as follows:

## II. NATURE OF THE ACTION

1. This is an action by Selling Source against Red River, its Chief Marketing Officer and Executive Vice President, Curtis Pope; its Chief Executive Officer, Carl Michael Lane; its Technical Support Engineer, Charlie Wurm; its Director of Operations, Gordon Jones; and its Lead Developer, Zurab Davitiani (collectively, "Defendants"), resulting from Defendants' (a) unlawful access to computers and electronically stored data, (b) deliberate misappropriation of Selling Source's and its customers' proprietary data, confidential and trade secret information, (c) deliberate creation of consumer confusion in connection with its offer of services, using Selling Source's proprietary information and other intellectual property, and (d) breach of written contracts and license agreements through these and other acts, including through misuse of Selling Source's proprietary software and source code to conceal its conversion of Selling Source's proprietary data.

2. Red River contracted to use Selling Source's products and services to enhance the efficacy of Red River's marketing efforts, and specifically to identify likely consumers of its short-term credit services. In furtherance of that relationship, Selling Source allowed Red River limited access to its facilities, assets, and intellectual property, and licensed to Red River certain proprietary software and source code. Without Selling Source's knowledge or consent, and using Selling Source's assets entrusted to Red River, Defendants thereafter launched a full scale effort to convert Selling Source's commercially valuable trade secrets (specifically, "lead" information) to enhance Red River's own database of potential customers. These acts were accomplished by Defendants, in substantial part, by unlawfully accessing Selling Source's computers and altering Selling Source's proprietary software to conceal that invasion.

3. Defendants' actions were intended and calculated to reap substantial financial gain for themselves, while depriving Selling Source of the fruits of its substantial labor and investment in developing valuable customer lead information. As a result, Selling Source and its lead service customers (including its primary customer, AMG) have suffered substantial damages.

4. By this Complaint, Selling Source seeks to enjoin Defendants' unauthorized access

to its computers and its conversion of Selling Source's proprietary, confidential and trade secret information.  Selling Source also seeks damages in an amount sufficient to compensate it for all past harm inflicted upon it by Defendants through their wrongful acts.

### III.   THE PARTIES

5. Plaintiff Selling Source, LLC is a Delaware Limited Liability Company with its principal place of business in Las Vegas, Nevada.

6. On information and belief, defendant Red River Ventures, LLC is a Delaware Limited Liability Company with its principal place of business is Las Vegas, Nevada.

7. On information and belief, defendant Curtis Pope is an individual residing in Las Vegas, Nevada, and is or was the Chief Marketing Officer and Executive Vice President of defendant Red River.

8. On information and belief, defendant Carl Michael Lane is an individual residing in Las Vegas, Nevada, and is or was the Chief Executive Officer of defendant Red River.

9. On information and belief, defendant Charlie Wurm is an individual residing in Las Vegas, Nevada, and is or was a Technical Support Engineer of defendant Red River.

10. On information and belief, defendant Gordon Jones is an individual residing in Las Vegas, Nevada, and is or was the Director of Operations of defendant Red River.

11. On information and belief, defendant Zurab Davitiani is an individual residing in Las Vegas, Nevada, and was or is a Lead Developer at defendant Red River.

12. On information and belief, Defendants "Does 1-100" are in some manner responsible for the wrongs and damages as alleged below, and in so acting were functioning, at least at times, as the agent, servant, partner, alter ego, and/or employee of the other Defendants, and in doing and/or not doing the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and/or employee with the permission, consent, or ratification of the other Defendants.

13. On information and belief, Defendants have acted and are acting in concert with respect to the allegations herein, and have conspired to undertake the unlawful activities alleged herein.

RC1/5347347.1/RC2                                  - 3 -                                  COMPLAINT; DEMAND FOR JURY TRIAL

## IV. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this matter pursuant to the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 et seq., the Electronic Communications Privacy Act ("ECPA"), at 18 U.S.C. §§ 2701 et seq., the Lanham Act, 15 U.S.C. § 1125, and pursuant to 28 U.S.C. § 1338.

15. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the claims arising from violations of Nevada statutory and common law since the facts supporting these claims are so related to the facts supporting the claims under the CFAA and ECPA that the claims form part of the same case or controversy.

16. This Court has personal jurisdiction over the Defendants because each of them does business in Nevada and/or has sufficient contacts with the State of Nevada to satisfy both the requirements of due process and Rule 4(k)(2) of the Federal Rules of Civil Procedure. Moreover, Defendant Red River expressly agreed that the Courts in Nevada would have personal jurisdiction over Red River to adjudicate any dispute relating to Red River's use of Selling Source's proprietary information, property, and services.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## V. INTRADISTRICT ASSIGNMENT

18. Pursuant to Nevada Civil L.R. IA 8-1, this action arises in and should be assigned to the Southern Division of this Court.

## VI. ALLEGATIONS COMMON TO ALL CLAIMS

**Plaintiff's Business, Trade Secrets and Proprietary Information**

19. Selling Source develops technology and marketing solutions for the specialty finance and micro-loan industry. Selling Source offers lender solutions, data solutions, consumer communication services, prepaid and stored-value marketing solutions, consumer acquisition services, and payment processing.

20. Selling Source is a "lead" marketing data source, and is a leader in consumer specialty finance lead generation. As pertinent to this action, a "lead" is information of a complete nature that allows (for example) a short-term loan provider the information to contact a

consumer who is interested in or seeking a short-term loan.

21. The main focus of Selling Source's business is the generation of leads through targeted advertising (including the accumulation of information from the internet), and the filtering, analysis and organization of data to create valuable leads which will meet the requirements of Selling Source's customers. Selling Source's customers are providers of short-term loans. Selling Source is not itself a lender. Selling Source's customers instead contact consumers of short-term loan services directly, utilizing lead information sold to them by Selling Source.

22. Selling Source has invested substantially in its process of lead generation and its manner of selling those leads to short-term providers who in turn utilize them to contact consumers of short-term loan services. Selling Source's targeted research, advertising and development of consumer leads has proven extremely successful, and has generated a significant database of potential consumers of short-term loan services. The potential consumer information, or "leads," generated through these efforts are the direct result of Selling Source's substantial labor and investment. In light of the competitive nature of the specialty loan markets, the customer lead information derived from PartnerWeekly's (one dba of Selling Source) efforts was, and is, commercially valuable. Accordingly, and in addition to its substantial expenditures toward lead generation and the sale of such leads to its customers for profit, Selling Source invested substantially in efforts to maintain the confidentiality of the lead information it successfully obtained and developed.

**Selling Source's Customer Contracts**

23. Selling Source generates business income by contracting with third-party businesses in the short-term lending industry to provide them with leads. In exchange, these third party customers make periodic payments to Selling Source, generally based on an agreed dollar amount per lead.

24. To facilitate the expeditious and timely transfer of lead data, and to enable prompt and accurate accounting and invoicing, Selling Source, in some cases, leases computers and other hardware, servers, and hosting services to its customers. Selling Source also licenses to some of

its customers software and source code (branded "eCash" by Selling Source), by which Selling Source transfers and tracks the leads furnished to its customers. The "eCash" software allows Selling Source and its licensed customers equal access to authorized lead data and transaction information so they may jointly track lead transfers and sales. Selling Source overtly, and by contract, monitors the eCash software and its automatically-generated reports to Selling Source of lead sales to Selling Source's customers.

25. AMG is a provider of short-term loans, and is Selling Source's largest customer. As with Selling Source's other customers, Selling Source and AMG entered into a written contract pursuant to which Selling Source agreed to provide consumer leads to AMG in exchange for periodic payments by AMG based on the number of leads provided and purchased. The leads sold by Selling Source to AMG are exclusive and proprietary to AMG as well as Selling Source. They are not otherwise sold or disclosed without permission, including to other providers of short-term loan services who might exploit them (and thereby diminish the value of the lead to AMG). As part of their relationship, Selling Source assures AMG that the leads furnished to AMG are of inherently high potential value, and have not previously been provided to AMG's competitors.

26. Given the scale and closeness of the relationship with AMG, Selling Source allows AMG to share access to the protected lead database. Tracking of lead transfer data and purchases therefore occurred on servers located at Selling Source's office and data center. AMG's lead data was stored on servers housed at Selling Source's premises for AMG's exclusive use.

**Red River Ventures, LLC**

27. Defendant Red River Ventures, LLC is also in the business of short-term lending. Red River and its associated business group (Quasar Corporate Services, Arrowhead Ventures LLC, and Hugo Marketing Services) are located in the same building as Selling Source, on a floor previously occupied by Selling Source. Defendants Curtis Pope (Red River's Chief Marketing Officer), Carl Michael Lane (Red River's Chief Executive Officer), Charlie Wurm (Red River's Technical Support Engineer), Gordon Jones (Red River's Director of Operations), and Zurab Davitiani (Red River's Lead Developer) were formerly employed by Selling Source. Michael

Lane was Selling Source's Chief Information Officer, and in that capacity gained knowledge of Selling Source's computer systems and operations, including data storage.

28. Red River is a smaller Selling Source customer. Red River's contract with Selling Source forbids Red River from using any provider of leads other than Selling Source.

29. In furtherance of their contract for lead services, Selling Source leased and licensed to Red River certain computers and other hardware, servers, and hosting. Selling Source also leased to Red River its proprietary "eCash" software and source code, through which Selling Source would sell and track leads sold to Red River. Red River was prohibited by contract from using any software other than eCash to process leads. The software License Agreement, appended to this Complaint as Exhibit A, provides as follows and in pertinent part:

    A. "Licensor [Selling Source] hereby grants to User [Red River] a personal, non-transferable, non-exclusive limited license to install and use the Software solely on the Designated Hardware, solely for processing relating to the internal operations of the User." (Parag. 2.a.)

    B. No right is granted to Red River to use Software in any manner not specifically permitted under this agreement. (Parag. 2.c.(iii).)

    C. Red River has no right, title or interest in the Software or the Source Code except for the license rights expressly granted herein. (Parag. 3.a.)

    D. User shall provide a copy of all Derivative Works [i.e., software programs developed by Red River and which incorporate or contain modifications of any part of the Software or Source Code] within thirty (30) days after creation of such works. (Parag. 3.b.iii.)

    E. Red River shall promptly report to Selling Source any unauthorized disclosure or any use of any Software of which it becomes aware, and shall take such further steps as may reasonably be requested by Selling Source to prevent unauthorized use thereof. (Parag. 8.)

30. By virtue of their former employment by Selling Source, Defendants Pope, Lane, Wurm, Jones, and Davitiani were aware of the particulars of eCash and the mechanism by which

it tracks the purchase and use of leads by Selling Source's customers. These Defendants were also aware that certain alterations to the eCash software and/or source code would prevent Selling Source from tracking lead purchases, resulting in leads being taken without detection and accounting.

**Defendants Invade Selling Source's Computers**

31. In or about July 2009, AMG reported to Selling Source that a large portion of the exclusive and proprietary lead information AMG had purchased from Selling Source, and which was stored on Selling Source's servers for AMG's exclusive use, had been compromised. AMG further reported that it detected the loss when its call center suffered an atypical and dramatic increase in consumers claiming that they had already been contacted by another short-term lender, and AMG suffered a corresponding downturn in its business.

32. The alternative short-term lender was (according to loan consumers contacted by AMG) utilizing software branded "iCash," and consumers familiar with AMG described the "iCash" loan interface as strikingly similar to AMG's "eCash" interface except for a logo designating "iCash." Moreover, consumers also reported that the earlier lender claimed to be associated with AMG as an affiliate, purchaser or subsidiary. AMG has no such associated entities, and did not authorize any to make such representations. Neither AMG nor Selling Source allowed another short term lender access to AMG's proprietary leads.

33. Before July 2009 and AMG's report to Selling Source, Red River stopped purchasing leads from Selling Source. Red River's telephone center (housed in the same building as Selling Source) nevertheless remained fully operational, despite Red River's contractual obligation to purchase customer leads exclusively from Selling Source. This fact, coupled with the fall in AMG's business and the reports to AMG from its prospective loan consumers, strongly suggested that Red River was somehow diverting lead information belonging to AMG. AMG later advised Selling Source that it was informed Red River had somehow gained access to Selling Source's servers, which contained AMG's exclusive lead information.

**Selling Source Investigates And Confirms Defendants' Unlawful Access Of Its Computers**

34. Selling Source immediately retained several forensic computer investigators and commenced a technical investigation. The investigation promptly confirmed that Red River had indeed gained access to Selling Source's servers, had thereby gained access to proprietary lead information belonging to Selling Source and AMG, and had converted (and was converting) that information. The investigation further revealed that Red River had so far avoided detection by making an unsanctioned alteration to Selling Source's proprietary "eCash" software. This was a misuse of the software, and a breach of Red River's software License Agreement with Selling Source.

35. Following these revelations, Selling Source continued its investigation and its work to collect and preserve its proprietary data, as well as other relevant evidence. Fearing that Red River would destroy computer data and evidence or otherwise harm Selling Source if alerted to Selling Source's investigation, Selling Source initially did not sever Red River's unauthorized connection to its server. In mid-July, however, Red River discovered the investigation by chance. The next day (and to prevent a possible "scorched earth" maneuver by Red River to conceal its thefts), Selling Source shut off all systems linked to Red River.

**Defendants Admit Their Wrongdoing**

36. On July 21, 2009, Selling Source CEO Derek LaFavor contacted Defendant Pope and invited him to a meeting. Pope appeared with Defendant Lane and Roger Croteau, Esq., counsel for Pope, Lane, and the Red River Entities. Selling Source confronted Pope and Lane with their wrongdoing—advising them that it was aware that Defendants had gained access to Selling Source's computers, had stolen customer leads, and misused Selling Source's "eCash" software and source code. Pope and Lane admitted engaging in these acts, expressing remorse. (For example, Pope conceded that he had "fucked up.") Pope and Lane also agreed to honor Selling Source's demand for immediate return of all property leased to Red River (which included computer servers and other hardware) and of the "eCash" software.

37. Despite Defendants' expressions of remorse and intent to "make it right," immediately after the meeting Defendants worked feverishly to conceal or destroy all evidence of

1  their wrongdoing. This included (a) shredding documents by the box, (b) removing computer
2  servers and other equipment from its office, and (c) secreting its operations. Both Wurm and
3  Jones were directly involved in absconding with the evidence. Selling Source's efforts to prevent
4  Red River from absconding with its property or relevant evidence were met with strong resistance
5  and (on at least one occasion) by a threat of force. By July 23 (two days after the Parties'
6  meeting), Red River had almost completely cleaned out and abandoned its office, leaving several
7  servers which it leased from Selling Source as well as some other computer hardware. The
8  hardware taken by Red River houses the information that will establish the elements of the theft
9  as well as will allow Red River to continue to harm Selling Source and AMG with the stolen
10 property information.

11        38.    Selling Source took possession of its servers and other equipment left at the Red
12 River office. Selling Source's forensic team cross-referenced lead information extracted from the
13 equipment previously located at Red River's office with lead information belonging to Selling
14 Source and AMG, housed on Selling Source's server for AMG's exclusive use. The majority of
15 leads discovered on the Red River server were proprietary to Selling Source and AMG, and could
16 only have been acquired by Red River through improper means.

17        39.    Red River's conduct as set forth above has worked serious harm—financial and
18 otherwise—to Selling Source and its business. AMG has severely cut back its business with
19 Selling Source and has threatened to terminate its contract with Selling Source altogether. AMG
20 cites Red River's infiltration of Selling Source's computer systems, and the resulting loss of
21 AMG's valuable data, as its reason for scaling back and possibly withdrawing as a Selling Source
22 customer. On information and belief, other Selling Source customers have diverted or will
23 likewise divert their business to other lead services providers for fear that their proprietary lead
24 information will be diverted, and that Selling Source will therefore not be able to warrant the
25 strength and exclusivity of its leads.

26                    **COUNT ONE—ALL DEFENDANTS**
27             **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq.)**
28        40.    Selling Source repeats and re-alleges each and every allegation made in the

1 foregoing Paragraphs as if fully set forth herein.

2  41. Selling Source's computers and computer network are protected within the meaning of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., because they are used in interstate or foreign commerce or communication. Selling Source's computers and computer system are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B).

 42. On information and belief, Defendants intentionally accessed Selling Source's computers or computer system without authorization and/or in excess of the scope of access authorized by Selling Source, and wrongfully obtained from those computers valuable proprietary, confidential, and commercially sensitive trade secret information. Defendants' unauthorized access of Selling Source's computers was for the purpose of converting Defendants' trade secret information to itself, to the detriment of Selling Source and its legitimate customers.

 43. The damage caused by the above actions of Defendants, and each of them, caused losses to Selling Source in the aggregate of at least $5,000 for each of them. In addition to the substantial value of the trade secret information and damages resulting from its conversion, these damages include the cost of responding to Defendants' offenses, taking protective measures, and conducting a damage assessment, which costs alone have exceeded $5,000 for each.

 44. The total amount of damages to Selling Source as a result of the violation of 18 U.S.C. § 1030 by Defendants is an amount to be determined at trial. Selling Source also seeks an injunction compelling Defendants to return any and all of its trade secrets, data, information, files, and documents obtained by and through its computer fraud.

**COUNT TWO—ALL DEFENDANTS**

**(Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701 et seq.)**

 45. Selling Source repeats and re-alleges each and every allegation made in the foregoing Paragraphs as if fully set forth herein.

 46. On information and belief, Defendants intentionally accessed, without authorization and/or in excess of the authorization granted by Selling Source, Selling Source's electronic communications service and obtained access to electronic communications while those communications were in storage, as that term is defined in 18 U.S.C. § 2510(17).

47.     On information and belief, Defendants thereby obtained electronic communications containing (among other things) confidential, proprietary, and commercially sensitive trade secret information, converting it to their own use to the harm of Selling Source and its legitimate customers.

48.     As a result of the violation of 18 U.S.C. § 2701 by Defendants, Selling Source has suffered damages in an amount to be determined at trial.

## COUNT THREE—ALL DEFENDANTS

**(Trade Secret Misappropriation In Violation Of NRS 600A.010 et seq.)**

49.     Selling Source repeats and re-alleges each and every allegation made in the foregoing Paragraphs as if fully set forth herein.

50.     Selling Source's proprietary, confidential, commercially sensitive, and trade secret information (i.e., its customer lead information) is not generally known to the public or other persons or entities who can obtain economic value from its disclosure or use.  It derives substantial independent economic value, both actual and potential, from not being generally known to the public or readily ascertainable by proper means by the public, and is the subject of reasonable efforts by Selling Source to maintain its secrecy.  The information constitutes "trade secrets" as defined in Nevada Revised Statutes ("NRS") 600A.030.

51.     On information and belief, Defendants, either directly or through the actions of others, willfully and maliciously misappropriated Selling Source's trade secrets by improper means, including (1) theft; (2) willful breach or willful inducement of a breach of a duty to maintain secrecy; (3) willful breach or willful inducement of a breach by Defendants of duties imposed by contract and/or license; and (4) electronic espionage.  Defendants have also disclosed or otherwise used Selling Source's trade secrets for their own financial gain and to the past and continuing harm of Selling Source and its customers.

52.     By reason of the above alleged acts and conduct of Defendants, Selling Source has suffered monetary damages to its business and will suffer great and irreparable harm and continuing damage.  The amount of harm will be difficult to ascertain, and Selling Source is therefore without an adequate remedy at law.  Selling Source is therefore entitled to injunctive

relief restraining Defendants, as well as their agents, employees, and all persons acting in concert with Defendants, from using, copying, publishing (to the Internet or elsewhere), disclosing, transferring, or selling Selling Source's trade secrets, or any derivative thereof, and restraining them from obtaining any commercial advantage or unjust enrichment from the misappropriation of Selling Source's trade secrets and derivatives.

53. Selling Source is further entitled to an order requiring Defendants, as well as their agents, employees, and all persons acting in concert with Defendants, to return to Selling Source any and all of its trade secrets, data, information, files, and documents.

54. Selling Source is further entitled to recover from Defendants damages sufficient to offset the losses sustained by Selling Source as a result of Defendants' wrongful acts described in this Complaint, and/or the unjust enrichment of Defendants they procured through their wrongful appropriation and use of Selling Source's trade secrets, in an amount to be determined at trial.

55. Defendants' acts of misappropriation were willful and malicious, wanton, and/or reckless, and were in disregard of Selling Source's rights as the owners of the trade secrets converted, compelling an award of punitive (exemplary) damages pursuant to NRS 600A.050.

56. Defendants' acts of misappropriation were willful and malicious, further entitling Selling Source to an award of attorneys' fees against Defendants pursuant to NRS 600A.060.

## COUNT FOUR—DEFENDANT RED RIVER

### (Breach of Contract)

57. Selling Source repeats and re-alleges each and every allegation made in the foregoing Paragraphs as if fully set forth herein.

58. Selling Source entered into a valid written software License Agreement with Red River. Selling Source thereby licensed to Red River certain software, source code and other confidential information (the "Software") for use in Red River's short term lending business. As part of the Agreement, Red River agreed to maintain the Software in confidence, not use the software for any improper purpose, and promptly report and work with Selling Source to remedy any misuse of the proprietary software.

59. Selling Source fulfilled all of its obligations under the License Agreement.

60. On information and belief, Red River breached the License Agreement by creating an unsanctioned derivative version of the Software without advising Selling Source, and using the new version to facilitate its invasion of Selling Source's protected computers. Defendants were thereby able to convert Selling Source's proprietary and confidential trade secret information. Red River further breached the Agreement by concealing from Selling Source this misuse of the Software, to ensure that Selling Source did not take immediate protective and remedial measures. Red River was therefore able to continue converting Selling Source's proprietary and confidential trade secret information without detection.

61. As a result of Red River's breach, Selling Source has suffered harm and will imminently suffer further harm, including the loss of trade secret and other confidential and proprietary information and damage to its business. The amount of this irreparable harm will be difficult to ascertain, and Selling Source is therefore without an adequate remedy at law.

62. Selling Source is entitled to an injunction restraining Red River and its agents, employees, and all persons acting in concert with it from using, copying, publishing, disclosing, transferring, or selling Selling Source's trade secrets, or any derivative thereof, and restraining them from obtaining any commercial advantage or unjust enrichment from the unlawful attainment and use of Selling Source's trade secrets and derivatives by virtue of its breach of the License Agreement.

63. Selling Source is further entitled to specific performance under the agreements, requiring Red River and its agents, employees, and all persons acting in concert with Red River to return to Selling Source any and all of its trade secrets, data, information, files, and documents, inasmuch as Red River has breached the Agreement by and through the acts set forth above.

64. Selling Source is further entitled to recover from Red River the actual, compensatory, and consequential damages sustained by Selling Source as a result of Red River's breach, or the value of Red River's unjust enrichment, in an amount to be determined at trial. Selling Source is at present unable to ascertain the full extent of such damages.

## COUNT FIVE—DEFENDANT RED RIVER

## (Federal Trademark Infringement, 15 U.S.C. § 1125)

65. Selling Source repeats and re-alleges each and every allegation made in the foregoing Paragraphs as if fully set forth herein.

66. Defendant Red River's use of the designation "iCash" in connection with its targeted promotions to consumers of short term loan services, in such manner as to imitate Selling Source's "eCash" software designation, constitutes a violation of § 43 of the Lanham Act, 15 U.S.C. § 1125. Red River is using the "iCash" mark to assist in its sale and promotion of services in a manner likely to cause confusion or mistake among consumers in a niche marketplace. Such usage has induced and is intended to induce prospective consumers of short term loan services to believe, contrary to facts, that Red River's services are approved, sponsored, or otherwise legitimately connected to Selling Source and its services.

67. Red River's activities are likely to cause damage to Selling Source's business reputation and goodwill, and are further likely to impede Selling Source's ability to market its services effectively.

68. Red River's activities have been willful, knowing, deliberate, malicious and intentional inasmuch as they were calculated to trade upon the goodwill and reputation of Selling Source and its marks, to the detriment of Selling Source and its legitimate customers.

69. Selling Source's business, goodwill, and reputation have and will continue to be irreparably harmed by Red River's activities unless and until Red River is enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Selling Source prays for judgment against DEFENDANTS as follows:

(a) Enjoining and restraining DEFENDANTS from the wrongful acts and conduct set forth above;

(b) Enjoining and restraining DEFENDANTS from using and disclosing Selling Source's proprietary, confidential, commercially sensitive, and trade secret information;

(c) Enjoining and restraining DEFENDANTS from destroying any property, emails, documents, or materials that are relevant or potentially relevant to this action;

  (d) Requiring DEFENDANTS to advise potential customers, potential employers, or other third parties that they provided information unlawfully obtained and used by DEFENDANTS; Requiring DEFENDANTS to divulge the identity of the individuals, groups and companies with whom they shared Selling Source's proprietary, confidential and trade secret information;

  (e) Requiring DEFENDANTS to hold in trust during the pendency of this action and transfer to Selling Source at the termination of this litigation, all documents, data, programs, and information relating to Selling Source's proprietary, confidential, and trade secret information;

  (f) Restitution;

  (g) The greater of actual, compensatory and consequential damages or the value of DEFENDANTS' unjust enrichment, or a combination of such damages where permitted by law;

  (h) Exemplary damages pursuant to NRS 600A.050 and where otherwise permitted by law;

  (i) Reasonable attorneys' fees in an amount to be determined at trial, pursuant to NRS 600A.060 and where otherwise permitted by law;

  (j) All costs of suit herein incurred, including investigative costs;

  (k) Pre- and post-judgment interest as provided by law; and

  (l) Such other and further relief in law or equity to which Selling Source may be justly entitled as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury.

Dated: August 11, 2009    ROPERS, MAJESKI, KOHN & BENTLEY

By:/s/ SPENCER C. MARTINEZ
 JAMES A. LASSART
 ADRIAN G. DRISCOLL
 SPENCER C. MARTINEZ
 Attorneys for Plaintiff
 SELLING SOURCE, LLC, a Delaware
 Limited Liability Company